## Commonwealth *v.* Smith, Appellant.

Argued March 10, 1958. Before RHODES, P. J., WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ. (HIRT and GUNTHER, JJ., absent).

*John H. Bream,* for appellant.

*Martin H. Lock,* Assistant District Attorney, with him *John A. Roe,* Assistant District Attorney, and *Huette F. Dowling,* District Attorney, for appellee.

OPINION BY ERVIN, J., April 16, 1958:

The appellant, Pete Smith, was indicted to Nos. 108 and 109, June Sessions, 1957, on charges of bookmaking and pool selling and conspiracy to do an unlawful act. There were four codefendants on the conspiracy charge, each of whom was also indicted separately on a charge of bookmaking and pool selling. One of the codefendants, Sam Plotnick, was also indicted on a charge of keeping a gaming house. All these indictments were consolidated for trial, at the conclusion of which the appellant and each of his codefendants were found guilty by a jury on all charges. After dismissal of appellant's motion for a new trial and sentence upon both indictments, Smith appealed.

On May 1, 1957, the Pennsylvania State Police conducted a raid at 317 Chestnut Street, Harrisburg, Pennsylvania, during which the appellant and his codefendants were arrested. The premises raided were known as "Sam's Billiard Parlor" and consisted basically of two rooms. The first room off the street was a pool room. The rear room was where the State Police found the appellant and his codefendants. The rear room contained a vast quantity of equipment and paraphernalia used in connection with a bookmaking operation, including an extremely large number of "bet

sheets" upon which innumerable wagers were entered, a considerable stock of unused lined pads of the type used by "bookies" for the purpose of recording bets, race information publications, record sheets showing the volume of business done by various "bookies" over a period of approximately a week and a half preceding the raid, quantities of office supplies, a wall pay telephone and another telephone, which were both registered to the raided premises, three telephones described as homemade and equipped with a flashing light rather than a bell and illegally connected to other lines, and a large quantity of headsets and other homemade telephonic equipment. In addition, there was an adding machine as well as a comptometer.

Trooper Regan, who was the first State Policeman to enter this rear room, testified that he saw the defendant, Smith, getting up from a chair, which was located in front of three small tables situated together at the rear or south wall of said room. He testified that Smith was dressed in a T-shirt; that on the tables were three Armstrong racing informational publications and quite a few bet sheets; that to the right of the chair from which Smith arose was a comptometer and to the left of said chair was a master record sheet indicating business done by various "bookies" for the week preceding the raid and for the first few days of the week of the raid. Corporal Corkran, Corporal Richardson and Sergeant McCartney all testified that telephone calls were received during the course of the raid in which the caller asked for "Pete" and in which bets were placed on horse races or information was requested concerning the results of certain horse races.

A great many such telephone calls were received, which were answered by the participating State Police officers. In addition to calls for "Pete," (the appellant's name is Pete Smith), there were calls for "Al"

and "Alex" (one of the defendants was Alex Fabiankovitz), for "Kippy" (one of the codefendants was Louis or Kippy Klein), for "Sam" (one of the defendants was Sam Plotnick), and for "Frankie" (another of the defendants was Frank Stilo). All the calls involved either wagers on horse races or requests for information relating to the outcome of same. The various officers taking calls would indicate to the caller that "Pete," "Al," "Kippy," "Sam," or "Frankie," as the case might have been, was not available; whereupon the caller would then talk to the person who answered the telephone.

Sergeant McCartney explained in great detail the manner in which a bookmaking operation was conducted. He identified, explained and interpreted the bet sheets upon which wagers on horse races were entered, as well as the record, or master sheet, upon which the volume of work done by various "bookies" for approximately a week and a half prior to the raid was noted. A representative of the Bell Telephone Company testified that there were only two telephones legally registered at Sam's Billiard Parlor. Both he and Trooper Regan testified that three of the telephones in operation, and over which calls were received by the State Police during the raid on the premises, were not Bell equipment but rather homemade devices.

From this testimony and evidence and following the charge of the court, the jury found the appellant, Pete Smith, guilty of bookmaking and pool selling and conspiracy to do an unlawful act.

The consolidation for trial of the indictments against the several defendants was within the sound discretion of the trial judge under the facts in this case. The subject has been dealt with so thoroughly and so exhaustively in recent opinions of both appellate courts that no citation of authority is necessary.

A superficial consideration of the above mentioned facts will clearly reveal that the verdict was not against the evidence or the weight of the evidence but was in accord therewith. Counsel for appellant admits that the evidence is sufficient to prove that a bookmaking establishment of considerable size was in operation. He contends, however, that the evidence was not sufficient to connect him with the enterprise. His very presence in the back room, attired as he was in a T-shirt, seated in close proximity to all of the paraphernalia used, according to the experts' testimony, in the operation of a bookmaking establishment would come very near to establishing a case against him. No decent law-abiding citizen would want to be found in such a place. But the clincher came with the admission of the testimony of the police officers that a number of telephone calls were received during the raid in which the caller asked for "Pete" and in which bets were placed on horse races or information was requested concerning the results of certain horse races. There was no other person present in the back room, where this operation was conducted, by the name of "Pete." This definitely tied the defendant to the illegal operation. This evidence was admissible. *Com. v. Prezioso,* 157 Pa. Superior Ct. 80, 41 A. 2d 350; *Com. v. Palace,* 164 Pa. Superior Ct. 58, 63 A. 2d 511; *Com. v. DuHadway,* 175 Pa. Superior Ct. 201, 103 A. 2d 489; *Com. v. Markwich,* 178 Pa. Superior Ct. 169, 113 A. 2d 323; *Com. v. Mattero et al.,* 183 Pa. Superior Ct. 548, 132 A. 2d 905; *Com. v. Parente,* 184 Pa. Superior Ct. 125, 133 A. 2d 561.

It is also contended that the Act of July 16, 1957, P. L. 1103, No. 411, §1, 15 PS §2443, prohibiting the interception of communications by telephone or telegraph without permission of the parties to such communication, is applicable to this case. We do not think

that the legislature intended the act to apply to a situation such as we have here. This was not an interception within the meaning of the act because the conversations between the callers and the police officers were direct and the callers elected to talk to the officers who answered the phone.

During the course of the summation by the prosecutor in the instant case, certain remarks were made to which defense counsel subsequently took objection. In his motion for new trial, appellant avers that the prosecutor stated: "The tremendous mass of evidence on the part of the Commonwealth has been undenied, unchallenged and uncontradicted by the defendant." The prosecutor, at oral argument, stated that it was his recollection that he definitely did not use the word "defendant" or "defendants." He said the word "defense" may have been used. The remarks which appear to have offended the defendant were not objected to immediately. Instead, the prosecutor continued his summation without interruption and at the conclusion an objection was made. The lower court was not requested to place its recollection of the remarks upon the record. No affidavit as to the alleged remarks made by the prosecutor in his summation was placed on the record. Nor was any immediate motion for the withdrawal of a juror made. A motion was made for the withdrawal of a juror perhaps 15 minutes or so after the initial objection and after a recess had been taken by the trial court.

The pertinent statute on this question is the Act of May 23, 1887, P. L. 158, §10, 19 PS §631, which provides that no adverse reference may be made by court or counsel in a criminal proceeding during the trial to the failure of the defendant to testify. The leading case on the procedure to be followed, where objection

has been taken to the remarks of counsel in a criminal action, is *Com. v. Wilcox,* 316 Pa. 129, 173 A. 653.

In the *Wilcox* case the Court refers to two well-recognized methods of procedure by the party objecting to the remarks of counsel: "(1) Following the objection and request for the withdrawal of a juror, the court should direct the stenographer to place upon the record the remarks *as the court understood them;* (2) on his failure to do so, counsel may place the remarks on the record by affidavit: Com. v. Shoemaker, 240 Pa. 255, 87 A. 684; Com. v. Shields, 50 Pa. Superior Ct. 1, 24; Faust v. Cotner, 105 Pa. Superior Ct. 177, 182, 160 A. 155; Com. v. Tauza, 300 Pa. 375, 380, 150 A. 649. But whichever course is pursued the objection and request for the withdrawal of a juror should be made at once, as soon as the objectionable language is used: Com. v. Windish, 176 Pa. 167, 170, 34 A. 1019; Com. v. Ezell, 212 Pa. 293, 296, 61 A. 930; Com. v. Shields, supra, page 24. The expression used in Com. v. Windish, was, 'while it was being delivered'; and in Com. v. Ezell, 'when counsel misstate facts or material evidence, or resort to comment unfairly or unduly prejudicial to the other side, it is the duty of the opposing counsel at once to call the attention of the court to the matter, and the action of the court may then become the subject of exception. In general it is matter for discretion and reviewable only for abuse.' "

In all cases the objectionable matter in the address of counsel to the jury must not only be excepted to but also must be placed properly upon the record: *Com. v. Windish,* 176 Pa. 167, 34 A. 1019; Sadler, Criminal Procedure in Pennsylvania, 2d ed., §561. See also *Com. v. Kline,* 66 Pa. Superior Ct. 285; *Com. v. Mazarella,* 86 Pa. Superior Ct. 382.

If one of these methods is not pursued so as to bring the objectionable remarks properly upon the record, they will not be considered on review: *Com. v. Del Vaccio*, 299 Pa. 547, 149 A. 696; *Com. v. Flori*, 300 Pa. 125, 150 A. 290.

In the present case, the remarks so objected to are not properly in the record. Although the defense objected, the objection was not made "at once" and no prompt motion for withdrawal of a juror was made. The proper method prescribed by the authorities cited above was not followed. On this basis alone, the objections of the defendant to the alleged remarks by the District Attorney given as a reason for a new trial should not be considered.

Ignoring the defects in procedure and considering the remarks themselves on their merit, they show no adverse comment in violation of the Act of 1887 on the failure of the defendant to take the witness stand: *Com. v. Morrison*, 180 Pa. Superior Ct. 121, 128, 118 A. 2d 258; *Com. v. Bova*, 180 Pa. Superior Ct. 359, 362, 119 A. 2d 866.

We are convinced the defendant had a fair trial and that his conviction was proper.

Judgments of sentence affirmed and appellant is ordered to appear in the court below at such time as he may be there called and that he be by that court committed until he shall have complied with his sentence or any part of it which had not been served at the time this appeal was made a supersedeas.